```
              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
                     EASTERN DIVISION
```

RON LOPEZ and CHRISTIE LOPEZ                              PLAINTIFFS

VS.                                  CIVIL ACTION NO. 4:10CV55TSL-LRA

SHELTER INSURANCE COMPANY                                  DEFENDANT

## MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendant Shelter Insurance Company for summary judgment on coverage issues, and a separate motion for summary judgment on bad faith claim, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiffs Ron Lopez and Christie Lopez have responded to the motions and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that Shelter's motion for summary judgment on the coverage issues is well taken and should be granted, which renders plaintiffs' bad faith claims, and Shelter's motion thereon, moot.

According to their complaint, in December 2007, Ron and Christie Lopez purchased and took possession of a home in Waynesboro, Mississippi that had been newly constructed by home builder Arthur Sturdivant.  Subsequently, in 2009, the Lopezes began noticing unexplained noxious odors, damage to appliances and damage to exposed metals in their home.  They also began experiencing adverse health effects, which forced them and their two minor children to move out of the home and into a garage on

the property. Although they initially were unaware of the cause of the problems they were experiencing, at some point, they learned that the home "had been constructed with defective Chinese manufactured drywall that was causing all of the problems in the home, the unexplained adverse health effects, and causing the home to be uninhabitable."[1]

---

[1] The Lopezes' experience is not uncommon. As the court explained in In re Chinese Manufactured Drywall Products Liability Litigation, 706 F. Supp. 2d 655 (E. D. La. Apr. 8, 2010), from 2004 through 2006, a shortage of construction materials in the United States, including drywall, resulted in the importation of Chinese-manufactured drywall, which was used primarily in the construction and refurbishing of homes in coastal areas of the United States, notably the Gulf Coast and East Coast. Id. at 659.
> Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes, and many began to complain of various physical afflictions believed to be caused by the Chinese drywall, all of which led to the filing of lawsuits in state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall.

Id. As the court went on to explain, the Chinese-manufactured drywall at issue in these cases differs from typical, benign drywall for the following reasons:
> 1. Chinese drywall has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur.
> 2. Chinese drywall releases reduced sulfur gases.
> ... These emissions are also confirmed by strong odors.
> 3. The sulfur gases released by Chinese drywall are irritating to the human body. ... Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things.
> 4. The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in. ...

Prior to their purchase of the home in 2007, the Lopezes had obtained a policy of homeowners' insurance from Shelter.  As a result of the damage to their home, the Lopezes made a claim for recovery on the policy.  Upon Shelter's failure to pay, they filed the present action charging that Shelter has wrongly denied coverage of their claim.[2]

In its present motion, Shelter asserts it is entitled to summary judgment declaring that its policy affords no coverage for the Lopezes' claims, because the injuries and damages which the Lopezes claim as a result of the use of allegedly defective Chinese-manufactured drywall in the construction of their home

---

> 5. The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. ... "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties.  Copper and silver metal components in [homes] are extremely vulnerable to corrosion from exposure to the sulfur gases. ...  The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals. ...  For example, a reaction of sulfur gases with copper pipes will form copper sulfide on the metals. ...  The reaction of sulfur gases with metals can be said to be "consuming" the useful, pure metals by replacing those metals with sulfides. ...
> 6. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices. ...

Id. at 663-666.

[2]  Plaintiffs' suit was filed in the Circuit Court of Wayne County, Mississippi against the builder, Arthur Sturdivant, for breach of contract and negligence, among other claims, as well as against Shelter.  The case was removed to this court, following which the claim against Sturdivant was severed and remanded.

were not caused by an "accident," as that term is defined in the policy and hence do not fall within the policy's coverage provisions, and/or because the claimed damages are explicitly excluded from coverage by two separate policy exclusions.

<u>Shelter's Policy</u>

In relevant part, Shelter's policy provides coverage, as follows:

> COVERAGE A – DWELLING
> 1. We cover accidental direct physical loss to the following property, except for those perils and losses excluded under the heading "Exclusions Applicable to Coverages A & B."
> (a) Your dwelling including building structures attached to it, at the residence premises....
>
> DEFINITIONS USED THROUGHOUT THIS POLICY
> 1.  Accident means an action or occurrence, or a series of actions or occurrences, that:
> (a) started abruptly,
> (b) during the policy period; and
> (c) directly resulted in bodily injury or property damage.
> ...
>
> 2.  Accidental direct physical loss means loss of possession of, or actual physical damage to, a part of the covered property which is caused by an accident
>
> EXCLUSIONS APPLICABLE TO COVERAGES A & B.
> We do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below.  That loss or damage is excluded from coverage regardless of:
> (a) the proximate cause of that event or condition;
> (b) the fact that other events or conditions which are not excluded, caused the loss or damage;
> (c) the fact that other events or conditions, which are not excluded, contributed to the loss or damage;
> (d) the sequence of the events or conditions that caused the loss or damage;
> (e) whether the events and conditions that caused the loss or damage occurred suddenly or gradually;
> (f) whether the loss or damage is isolated or widespread; or

4

>     (g) whether the loss or damage arises from natural
>     forces, external forces, or a combination of such
>     forces.
>     ...
>     10. ... latent defect ... contamination....
>     ...
>     19. Any defect, inadequacy, fault, unsoundness or
>     weakness in:
>     (a) material used in construction or repair;
>     ...

<u>Accidental Loss</u>

In its motion, Shelter argues that the Lopezes have not and cannot prove an "accidental direct physical loss" to their home, as they allege no action or occurrence that "started abruptly." In their response to the motion, plaintiffs do not deny that their losses did not start abruptly.  Rather, they suggest that this court may disregard the Shelter policy's definition of "accident" and instead apply the definition of "accident" indicated by the Mississippi Supreme Court in <u>Allstate Ins. Co. v. Moulton</u>, as "anything that happens or is the result of that which is unanticipated.... As used in insurance policies, it is simply an ... unexpected event, usually of an afflictive or unfortunate character."  464 So. 2d 507, 509 (Miss. 1985) (quoting <u>Winkler v. Ohio Cas. Ins. Co.</u>, 441 A.2d 1129, 1132).  Plaintiffs contend that by reference to the definition of "accident" cited in <u>Moulton</u>, the physical loss caused in their home by the Chinese drywall is "accidental" for purposes of coverage since the damage caused by the drywall was "unexpected" and "unanticipated" and not the result of any intentional act.

However, the court may look outside the policy for the definition of a policy term only where the policy itself does not provide a definition, see Corban v. United Servs. Auto Ass'n, 20 So. 3d 601, 609 (Miss. 2009) (court's role is to render fair reading and interpretation of policy by examining its express language and applying "ordinary and popular meaning" to any undefined terms"); and plaintiffs' insinuation to the contrary is plainly unfounded. As Shelter notes, Mississippi law requires that policy terms and definitions be enforced as written. See Noxubee County School Dist. v. United Nat'l Ins. Co., 883 So. 2d 1159, 1166 (Miss. 2004) (holding that "[i]nsurance policies are contracts, and as such, they are to be enforced according to their provisions" and "[i]nsurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain") (citing United States Fid. & Guar. Co. v. Knight, 882 So. 2d 85, 92 (Miss. 2004)). Applying and enforcing the definition of "accident" as set forth in Shelter's policy, it is clear that plaintiffs' loss was not "caused by an accident" and that the policy therefore affords no coverage for the Lopezes' claimed losses.[3]

---

[3] The court notes that in In re Chinese Manufactured Drywall Products Liability Litigation, two of the insurers' policies required that the direct physical loss be "sudden and accidental" for coverage to apply. On the issue whether loss caused by Chinese drywall was "sudden," the court noted that the policies did not define "sudden," but that Louisiana jurisprudence defined "sudden" for purposes of a homeowners' insurance policy to

6

Exclusions

Shelter further argues that even if plaintiffs had asserted an accidental physical loss within the policy's coverage provisions, such coverage would nevertheless be excluded by the policy exclusion for loss or damage caused by "latent defect[s]" or "contamination," and by the "faulty materials" exclusion.  In the court's opinion, while Shelter has not proven that the "latent defects" exclusion applies, the exclusions for loss caused by "contamination" and "faulty materials" are clearly applicable.

Latent Defect

Shelter's policy excludes from coverage losses caused by "latent defect", but it does not define the term, and there are no Mississippi cases which define the term.  However, as this is a standard exclusion in a homeowners' policy, it is not difficult to find cases that have addressed its meaning, including cases involving Chinese drywall.

In Travco Insurance Co. v. Ward, 715 F. Supp. 2d 699 (E.D. Va. 2010), the court held that losses to the insured home from defective Chinese Drywall fit squarely within Virginia's

---

mean "an event which is either abrupt (though expected), or unexpected."  759 F. Supp. 2d 822, 834 (E.D. La. 2010).  The court found that under these definitions, the damage caused by the Chinese drywall in the homes of the insureds was accidental, as such damage was alleged to have been "unexpected," "unknown," and "unusual."  Id.  Notably, the court turned to state law for a definition of "accident" since the policy did not include a definition; and the court found the losses to be the result of an accident because the definition included losses caused by events that were either abrupt *or* unexpected, and the losses were claimed to have been unexpected (although not abrupt).

7

definition of "latent defect," as "flaws in property that are undetectable, and hence unexpected," id. at 710 (citing Glens Falls Ins. Co. v. Long, 195 Va. 117, 77 S.E.2d 457, 459 (1953), which defined "latent defect" as "defect which reasonably careful inspection will not reveal"), *and* which are "'integral to the damaged property by reason of its design or manufacture or construction,'" id. (quoting U.S. West v. Aetna Cas. & Sur. Co., 117 F.3d 1415 (4th Cir. 1997)).  However, while the court held that damage to the house itself was excluded, it held that the exclusion did not apply to damage to the home's air conditioner and garage door, reasoning that "[t]he Chinese Drywall in the Ward Residence is not integral to the damaged air conditioner or garage door.  To the contrary, there is no indication that the air conditioner or the garage door were manufactured or constructed in a defective manner."  Id. at 711.

The court in In re Chinese Manufactured Drywall Products Liability Litigation (In re Chinese Drywall Litigation), 759 F. Supp. 2d 822 (E.D. La. Dec. 16, 2010), concluded that the analysis in Travco, while thorough and sound, could not be given much weight in a case involving Louisiana law, since Louisiana has a different definition of "latent defect" than Virginia:  "The definition of latent defect under Louisiana law requires that the defect be hidden and not discoverable upon a reasonable, customary inspection or test."  Id. at 836 (citing Nida v. State Farm Fire & Cas. Co., 454 So. 2d 328, 335 (La. App. 3 Cir. 1984)).  The court

8

considered it a "close call" whether the latent defect exclusion applied to the losses from the Chinese drywall, noting that while the insureds "were not aware that their homes contained Chinese-manufactured drywall and the damages to their homes were caused by this drywall until they learned of the problem through the media or otherwise," they "were aware before the media reports that their homes contained a foul odor, their electrical wires and components were blackened, and their electrical devices and appliances were failing." Id. at 838.  It was unclear to the court "whether the latent defect exclusion is avoided through knowledge or discoverability of the specific cause of defects in an insured property or simply by the knowledge of the defects themselves," and ultimately, being "unable to make a definitive determination as to whether the damage caused by the Chinese drywall in the Plaintiffs' homes constitutes a latent defect," the court concluded the insurers had failed to meet their burden to prove applicability of the latent defect exclusion. Id. at 838-39.

More recently, in Ross v. C. Adams Construction & Design, L.L.C., --- So.3d ----, 2011 WL 2328271 (La. App. 5 Cir. June 14, 2011), the court, applying an identical Louisiana definition of "latent defect," found a "latent defect" where the Chinese drywall that caused the damages sustained by homeowners "was hidden and unknown for two years." 2011 WL 2328271.

9

The "latent defect" definition cited in <u>In re Chinese Drywall Litigation</u> and <u>Ross</u>, i.e., as "a defect that is hidden or concealed from knowledge, as well as from sight, and which a reasonable customary inspection would not reveal," <u>Ross</u>, 2011 WL 2328271, is typical. <u>See</u> Black's Law Dictionary, 794 (5th ed. 1979) (defining "latent defect" as "[a] hidden or concealed defect ... which could not be discovered by reasonable and customary inspection,"); <u>Couch on Ins.</u> § 153:77 (3d ed. 2010) (defining "latent defect" as "an imperfection in the materials used which could not be discovered by any known and customary test") (citations omitted).

The Chinese drywall in the Lopezes' home was defective from the time it was initially installed, although the defect did not manifest itself until some time after they had begun living in the home. Even then, the Lopezes were unaware initially that the cause of the problems they were experiencing with their home was the Chinese drywall (there is nothing to indicate they were aware their home had been constructed with Chinese drywall); and they allegedly only discovered through media reports and subsequent investigation that Chinese drywall was the likely culprit. These facts would certainly tend to suggest the defect was latent. However, as the court recognized in <u>In re Chinese Drywall Litigation</u>, it is Shelter's burden to prove that the exclusion applies, <u>see</u> <u>Commercial Union Ins. Co. v. Byrne</u>, 248 So. 2d 777, 782 (Miss. 1971), and while Shelter has plausibly argued that the

10

Chinese drywall was a "latent defect," it has not actually proven that the defective drywall could not have been discovered by any known and customary test.  The court therefore is unable to conclude on the present motion that the "latent defect" exclusion applies.

<u>Faulty Materials</u>

The policy excludes coverage for loss or damage caused by "any defect, inadequacy, fault, unsoundness or weakness in material used in construction," i.e. the "faulty materials" exclusion.  The policy itself does not define "defect" or "fault," and no Mississippi case defines these terms in the context of a defect or faulty materials exclusion in a homeowners' policy.  The Lopezes note that in Merriam-Webster Dictionary, "fault" is defined as "a physical ... imperfection or impairment," and "defect" as "an imperfection that impairs worth or utility." Http://www.merriam-webster.com/dictionary.  And Black's Law Dictionary (9th ed. 2009) defines "material" as "of or relating to matter; physical".  On the basis of these definitions, the Lopezes reason that since the Chinese-manufactured drywall in their homes is functioning properly and serving its intended purposes, its utility is in no way impaired and thus it is not "faulty" and the exclusion should not apply to preclude coverage of their claim.

Three courts have considered and rejected this very argument. As here, the insurer in <u>Travco</u> argued that the exclusion for "loss caused by ... [f]aulty, inadequate or defective ... [m]aterials

11

used in ... construction ... of part or all of the property" applied "to preclude coverage of all damage resulting from the defect in the drywall," whereas the insured contended the exclusion did not apply because the Chinese Drywall "[was] serving its normal function and purpose and has not caused damage to itself."  715 F. Supp. 2d at 712.  The court was skeptical of the argument that the drywall was "serving its intended purpose":

> Although the Drywall has not collapsed or otherwise physically deteriorated, it is certainly not serving its purpose as a component of a livable residence.  In any event, Defendant's argument–that an item cannot be faulty or defective if it is "serving its intended purpose"–is contrary to ordinary English usage.  In common parlance, the word "faulty" is not limited to faults that prevent an entity from accomplishing its intended purpose and itself. See Oxford English Dictionary (2d Ed. 1989) (defining "faulty" as "[c]ontaining faults, blemishes or defects; defective, imperfect, unsound").  The same principle applies to the word "defective."

Id. at 712-713.  It noted, moreover, that in his state court lawsuit, the insured had himself repeatedly described the drywall as "defective"; and while this was not determinative, the court considered that "in the absence of some evidence that the parties intended to assign a specialized meaning to the word 'defective' in the Policy, the fact that Defendant himself described the Drywall as 'defective' certainly weighs in favor of the application of the exclusion."  Id. at 713.

As in Travco, Judge Fallon in In re Chinese Drywall Litigation found that Chinese-manufactured drywall was subject to the "faulty materials" exclusion in the plaintiffs' homeowners'

12

policies, and that the loss resulting therefrom was excluded from coverage. 759 F. Supp. 2d at 845. The court likened the drywall to materials containing asbestos and lead in buildings, which had been found to trigger the "faulty materials" exclusion, and to radioactive table bases which in Falcon Products, Inc. v. Insurance Co. of the State of Pennsylvania, 615 F. Supp. 37 (E.D. Mo. 1985), had been found to fall within the "faulty materials" exclusion because, while they could serve their intended purpose as table bases, they were "unusable" because of the contaminated materials used in constructing them. Id. at 845. The court observed that

> [a]lthough the drywall serve[d] its intended purpose as a room divider, wall anchor, and insulator, the allegations in the complaints provide that the drywall emits foul-smelling odors and releases gases which damage silver and copper components in the home, including electrical devices, appliances, and wiring. Accordingly, the drywall is like the radioactive table bases and building components containing asbestos or lead which function for all practical purposes as table bases and building components, but are faulty because the materials of which they are composed.

759 F. Supp. 2d at 845-46. The court opined that

> The broad definition of faulty materials under common usage of a defect or imperfection in a physical thing lends further support to the finding that the Chinese drywall constitutes a faulty material. Furthermore, as the Travco court recognized, it is inconsistent to argue that Plaintiffs have suffered a loss due to the Chinese drywall, but that the drywall is not in any way faulty. The whole basis of the Plaintiffs' claims is that the Chinese drywall in question was faulty and rendered homes unlivable.

Id. at 846.

13

And most recently, in <u>Ross</u>, the court, citing <u>Travco</u>, agreed with the insurer's position and found that "even if the drywall is still in place in the home, it is not truly serving its intended purpose as a component of a livable residence because of its inherent qualities of emitting the sulfuric gas." <u>Ross</u>, 2011 WL 2328271, 2.  This court concurs fully with the courts' reasoning and conclusion in these cases, and accordingly, concludes that the losses claimed by plaintiffs herein are subject to the "faulty materials" exclusion in Shelter's policy.[4]

---

[4]   Plaintiffs' complaint, in which the following allegations appear, repeatedly alleges that the drywall in their home was defective:

> The new home they purchased from Defendant Sturdivant had been constructed with *defective Chinese manufactured drywall* that was causing all of the problems in the home, the unexplained adverse health effects, and causing the home to be uninhabitable;
>
> the Defendant Sturdivant is aware of *the defective nature of the Chinese-manufactured drywall* that he used in the construction of [their] home ...;
>
> the Defendant Sturdivant, despite his knowledge of *the defective nature of the Chinese-manufactured drywall*, ... knowingly *used the defective product* in the construction of their home...;
>
> Defendant Sturdivant knew our should have known that *the drywall used in constructing the home was defective*, *did not function as intended and/or created a high risk of unreasonable, dangerous side effects*, ... thereby rendering the home uninhabitable; and
>
> the construction and sale of the home to the Plaintiffs *containing defective Chinese-manufactured drywall* constitutes a breach of express and implied warranties of habitability and other warranties ....

14

Contamination

Shelter's policy also excludes damages for losses caused by "contamination." Both Travco and In re Chinese Drywall Litigation considered exclusions for losses caused by contaminants, but they did so in the context of traditional pollution exclusions, which defined "pollutants" to include "contaminants." The court in In re Chinese Drywall Litigation concluded the pollution exclusion did not apply to the losses from the Chinese-manufactured drywall since Louisiana law interprets such pollution exclusions to apply only to traditional industrial environmental pollution claims. In re Chinese Drywall Litigation, 759 F. Supp. 2d at 841.[5] In contrast, the court in Travco held that losses from Chinese drywall were covered by the exclusion since Virginia law does not limit applicability of pollution exclusions to traditional environmental pollution and since the losses were caused by a contaminant. Travco, 715 F. Supp. 2d at 717. In support of the latter conclusion, the court wrote:

> Although the Drywall itself may not be a pollutant, the gases it releases are. There is no dispute that the Chinese Drywall has released reduced sulfur gases into the Ward Residence. ... [T]he broad definition of pollutants in the Policy includes "any solid, liquid,

---

[5]   The court notes that in the recently-decided Ross v. C. Adams Construction & Design, L.L.C., --- So.3d ----, 2011 WL 2328271 (La. App. 5 Cir. June 14, 2011), the court did not recognize this limitation, and held that "[t]he sulfuric gas emitted from the Rosses' drywall qualifies as a pollutant pursuant to this definition in the policy. Therefore, any damage caused by the release of these gases is excluded from coverage by the homeowners insurance policy."

15

>     gaseous or thermal irritant or contaminant, including
>     smoke, vapor, soot, fumes, acids, alkalis, chemicals and
>     waste."  Under any reasonable definition of these terms,
>     the gases released into the Ward Residence qualify as
>     irritants and contaminants.

Id. at 715.

Since the contamination exclusion in Shelter's policy does not appear in the context of a pollution exclusion, a determination of the applicability of the exclusion does not depend on whether Mississippi broadly or narrowly interprets pollution exclusions.  However, the court's conclusion in Travco is relevant and persuasive.  The court noted in Travco that "contaminant," as the term is used in insurance contracts, has been defined as a "substance that, because of its nature and under the particular circumstances, was not generally supposed to be where it was located and caused injurious or harmful effects to people, property, or the environment."  Id. at 718 n.9 (quoting Hastings Mut. Ins. Co. v. Safety King, Inc., 286 Mich. App. 287, 778 N.W.2d 275 (2009)); see also Hastings Mut. Ins. Co., 778 N.W.2d at 280 ("contaminate" means "to make impure or unsuitable by contact or mixture with something unclean, bad, etc.," and "something that contaminates or carries contamination")(quoting Random House Webster's College Dictionary (1997)); American Cas. Co. of Reading, Pa. v. Myrick, 304 F.2d 179, 183 (5th Cir. 1962) (finding definition of "contamination" as the "'state of being contaminated; an impurity; that which contaminates; to make inferior or impure by mixture; an impairment of purity; loss of

16

purity resulting from mixture or contact' [to be] consistent with common understanding, see Webster's New International Dictionary, contamination, contaminate, which is the proper criterion for construing words in an insurance policy").

The Travco court concluded that "[t]he sulfur gas in the Ward Residence clearly fits within this definition, because it was not 'supposed to be' in the Residence and it has harmed Defendant and the components of his home." 715 F. Supp. 2d at 718 n.9. Other cases have found a contamination exclusion unambiguous, and applicable in analogous circumstances on the basis of the same or similar definitions of "contamination." See, e.g., Conde v. State Farm Fire & Cas. Co., 43 F.3d 1471, 1994 WL 705073, 2 (6th Cir. 1994)(Table) (applying Webster's Third International Dictionary's definition of contamination as "unfit for use by the introduction of unwholesome or undesirable elements" to find that insured's home was "contaminated" where it had been negligently treated for termites with chlordane, resulting in adverse health effects and forced insureds to move from home); Hartory v. State Auto. Mut. Ins. Co., 552 N.E.2d 223 (Ohio App. 1988) (applying Webster's definition and holding that contamination exclusion precluded coverage for damages resulting when methane gas from a neighboring landfill penetrated the plaintiffs' home forcing them to evacuate); Auten v. Employers Nat. Ins. Co., 722 S.W.2d 468 (Tex.App.–Dallas 1986) (holding that insureds' loss resulting from exterminator's misapplication of pesticides which rendered their

17

home uninhabitable, was caused, as matter of law, by contamination and, thus, was excluded under terms of all-risks homeowners' policy); St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co., 464 F. Supp. 2d 397, 415 (M.D. Pa. 2006) (finding that escape of chlorine gas resulting in the cloud of hydrochloric and hypochlorous acids that settled on equipment throughout the insured premises met definition of "contamination," as "it rendered the covered property unfit for use by the introduction of unwholesome or undesirable elements by entering into or coming in contact with the covered property"), vacated on other grounds, 472 F. Supp. 2d 630 (M.D. Pa. 2007).  The same analysis applies here, and leads the court to conclude that the contamination exclusion in Shelter's policy applies to preclude coverage for the Lopezes' claimed losses.

   Conclusion

   Based on the foregoing, it is ordered that Shelter's motion for summary judgment is granted.

   A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

   SO ORDERED this 17th day of June, 2011.


                                   /s/ Tom S. Lee
                                   UNITED STATES DISTRICT JUDGE